**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 19-CR-4065-LTS-KEM |
| vs. | |
| | **REPORT AND** |
| | **RECOMMENDATION** |
| MELROY JOHNSON SR., | |
| Defendant. | |

———————————

## *TABLE OF CONTENTS*

I.     *BACKGROUND* ........................................................................................... 2

II.    *EXTENSION OF PRETRIAL-MOTION DEADLINE* ................................... 11

III.   *MOTION TO SUPPRESS* ........................................................................... 12

   A.   *Probable Cause on the Face of the Affidavit* ............................................. 12

   B.   *False Statements and Omissions in the Affidavit* ...................................... 15

   C.   *Execution of the Search Warrant* ............................................................. 21

IV.    *CONCLUSION* ........................................................................................... 25

Defendant Melroy Johnson Sr. moves to suppress evidence obtained pursuant to an anticipatory search warrant, arguing that the affidavit in support of the warrant did not establish probable cause to search,[1] that the affidavit omitted material facts, and that the condition precedent set forth in the anticipatory warrant did not occur.  Doc. 185. The Government resists.  Doc. 195.  I recommend **denying** the motion to suppress.

---

[1] Johnson does not take issue with my review of probable cause for the motion to suppress, even though I was the judge who signed the warrant originally. *See also United States v. Mathis*, No. 18-cr-18 (1) (DWF/LIB), 2018 WL 4473529, at *10-11 (D. Minn. July 17, 2018) (collecting cases holding that for purposes of a motion to suppress, a magistrate judge may address the sufficiency of probable cause in a warrant issued by the undersigned magistrate judge), *report and recommendation adopted*, 2018 WL 4062741 (Aug. 27, 2018).

# I.     BACKGROUND[2]

In early June 2019, Postal Inspector Ryan Brandt became suspicious about packages being mailed to a Sioux City address from Orange, California, using a fictitious return address. Along with Sioux City Police Officer Eric Davis, assigned to the Tri-State Drug Task Force, Inspector Brandt conducted a "knock and talk" at the delivery address listed on these packages, where the officers encountered a person I will refer to as Source of Information ("SOI").[3] SOI consented to the search of the package, which revealed about five pounds of methamphetamine. SOI told the officers that the package was intended for Melroy Johnson and that SOI had received six previous packages on his behalf, mailed by Felton Fitzgerald in California. SOI said that SOI delivered the packages to Johnson, and in return, he gave SOI money and crack cocaine for personal use. SOI also told the officers that Johnson sometimes gave SOI envelopes to mail to California, which SOI believed contained money. SOI refused to deliver the package to Johnson.

Officer Davis remained in contact with SOI as the investigation continued. When SOI first named "Melroy Johnson" as the intended recipient, Officer Davis thought SOI meant Melroy Johnson, Jr. When he discovered two Melroy Johnsons living in the Sioux City area—Jr. and Sr.—Officer Davis returned to SOI, who clarified that Melroy Johnson, Sr., received the packages. Officer Davis also learned through follow-up contact with SOI that SOI delivered the packages to Johnson's apartment. SOI provided Johnson's address in the Woodbury Heights apartment complex, and Officer Davis confirmed that Johnson lived there through utilities bills and the CLEAR database. SOI also indicated that other people in the Sioux City area received packages for Johnson, but SOI did not know their identities.

---

[2] The facts in this section are taken from the testimony at the suppression hearing and the recorded interviews of Individuals 1 and 2 unless otherwise noted.

[3] The cooperators are referred to as SOI and Individuals 1 and 2 to protect their identities; Individuals 1 and 2 are labeled consistently with the briefs.

After learning about others' involvement, in late July, Inspector Brandt began looking at all packages mailed from Orange, California, to the Sioux City area. On August 2, he identified a package addressed to a residence in the 2100 block of McDonald Street as suspicious, because its approximate weight and handwritten label in marker were similar to the package delivered to SOI that contained methamphetamine. Officer Davis, along with others, conducted surveillance of the package's delivery on August 2. They observed a person (later identified as Individual 1) approach the postal employee and claim the package. Individual 1 took the package and went into a nearby duplex with a different address than the one on the package. Law enforcement did not see which residence of the duplex Individual 1 entered. A little more than an hour later, Individual 1 left with another person (later identified as Individual 2). Law enforcement followed them to a television-repair business. Both went inside, but Individual 1 returned to the duplex after about twenty to thirty minutes, while Individual 2 stayed at the business. Law enforcement continued surveilling both individuals at the duplex and at the business, but they did not see anything further. In all, they watched them for five and a half to six hours after the delivery of the package.

Inspector Brandt identified another suspicious package on August 27, from Vista, California, to the 2100 block of McDonald Street (but a different address than the August 2 package). *See* Doc. 186-2. It weighed twelve pounds and listed both a sender's name and recipient's name not associated with the listed addresses. *Id.* After a K-9 alert on the package the next day, Inspector Brandt obtained a warrant to search the package. *Id.* The search revealed a stereo speaker and two purses containing pound quantities of methamphetamine.

Inspector Brandt repackaged the stereo and drugs and, posing as a letter carrier, delivered the package around 2:00 p.m. on August 28. A woman was sitting outside the residence, and he asked if she was expecting a package. When she did not respond, he set the package down and walked away. Before he reached the mail truck, he heard Individual 1 yelling at him that the package belonged to Individual 1, and he saw

3

Individual 1 retrieve the package and take it into the duplex next door.  Because the law enforcement team conducting surveillance did not see which door of the duplex Individual 1 entered, an officer knocked on one of the doors under a ruse, and law enforcement confirmed the target residence when Individual 1 came to answer the door.

Officer Davis obtained a search warrant for the residence Individual 1 had entered with the package.  *See* Doc. 229-1.  Law enforcement executed the warrant around 4:00 p.m.  While other officers searched (ultimately finding methamphetamine and cocaine), Inspector Brandt interviewed Individual 1, and Officer Davis interviewed Individual 2. Individual 1 originally denied any knowledge of the package's contents, saying Individual 1 retrieved the package at Individual 2's direction (the two were in a romantic relationship).  When Inspector Brandt indicated he knew they planned to bring the package to a third party, Individual 1 stated Individual 1 did not know the guy's name, but they called him Arkansas.  Inspector Brandt asked what Arkansas looked like, and Individual 1 described a Black man in his mid40s or maybe older, noting all Black men looked alike to Individual 1.  Individual 1's description matched Johnson, and Inspector Brandt recalled seeing mailing addresses associated with Johnson in Arkansas.  Inspector Brandt showed Individual 1 a photograph[4] of Johnson, and Individual 1 agreed that was the person described.  Individual 1 stated that the man in the picture had approached Individual 2 at the television-repair business and that Individual 2 had fixed his television and visited his residence a few times.  Inspector Brandt asked if Individual 1 would remember the man's name if he said it.  Individual 1 said Individual 1 had never heard his real name before.  Inspector Brandt asked if the name Melroy Johnson rang a bell, and Individual 1 said the name sounded familiar, suggesting Individual 1 might have seen it on receipts for the business.  Individual 1 stated Johnson lived in the Woodbury Heights

---

[4] Officer Davis obtained a photo of Johnson and another Black man from Johnson's Facebook page and provided it to Inspector Brandt.  Inspector Brandt cropped the photo so that it depicted only Johnson; this is the photo he showed to Individual 1.  *See* Doc. 219.  Officer Davis showed the original, uncropped version of the photo to Individual 2 (discussed below).

apartment complex. Individual 1 stated Individual 1 knew where Johnson's apartment was located but did not know the address or apartment number. Individual 1 stated Individual 1 had met Johnson three to four times, visiting his apartment when Individual 2 went to work on the television.

Individual 1 said they had received one prior package, maybe two, which Individual 2 had taken to Johnson. Individual 1 denied knowing what Individual 2 received in exchange but admitted both Individual 1 and Individual 2 used methamphetamine. After Inspector Brandt talked to Officer Davis, he again asked Individual 1 what happened after they received the packages, letting Individual 1 know that Individual 2 was cooperating. Individual 1 stated they went to Woodbury Heights. Inspector Brandt asked if Individual 2 took a Lyft, while Individual 1 followed by car. Individual 1 nodded. Individual 1 indicated willingness to deliver the package to Johnson as planned. Individual 1 noted they planned to go to Woodbury Heights after a child's birthday party, around 8:30 or 9:00 p.m. Throughout the interview, Individual 1 expressed concern about "doing someone else's time," noting Individual 1 had not been in trouble since acquiring a felony drug conviction at age 18.

While Inspector Brandt spoke to Individual 1, Officer Davis talked to Individual 2. Like Individual 1, Individual 2 originally denied any involvement in the drug trade. Individual 2 became willing to talk, however, once Officer Davis indicated that law enforcement already knew Individual 2 was receiving packages of drugs from California and that they knew the ultimate recipient of those drugs, showing Individual 2 a picture of Johnson. The picture showed two Black men. Individual 2 pointed to Johnson in the photo, saying they called him Barbecue; Individual 2 denied knowing the other man. Individual 2 said Individual 2 did not know Barbecue's real name, saying, "It's Mel or...?" Officer Davis cut Individual 2 off, affirming that Mel was correct. Individual 2 said that they had met Johnson through his television-repair business, noting it was like Johnson "knew [they] used" and "tracked [them] down" to receive packages for him. Individual 2 stated they had received two prior packages in addition to the one that day.

5

Individual 2 indicated they would open the package, put the drugs in a different package, and then bring the drugs to Johnson at his apartment, calling beforehand to let him know they were on their way, saying, "I've got your shoes," which was code for methamphetamine. Individual 2 stated Johnson lived in a first-floor apartment in the Woodbury Heights apartment complex. Officer Davis pulled up a map of the Woodbury Heights apartment complex on his phone, and Individual 2 identified Johnson's building. Individual 2 stated that in exchange, they were fronted one pound of methamphetamine to sell, for which they later owed Johnson $6,000. Individual 2 indicated they traveled separately to bring the drugs to Johnson: Individual 2 took the drugs in a Lyft, and Individual 1 picked Individual 2 up from Johnson's apartment. Individual 2 stated that this was the first time the package had contained cocaine, noting Johnson wanted something he liked. The cocaine had been hidden in the speaker, explaining why law enforcement did not find it during their initial search of the package. Individual 2 indicated that they were not the only people who received packages for Johnson. Individual 2 noted Individual 2 had heard about law enforcement's encounter with someone else who received packages for Johnson, and Individual 2 wondered why that person was not in jail (likely referring to SOI). Individual 2 expressed willingness to deliver the package to Johnson but refused to participate without Individual 1, since they both had delivered the packages in the past. Throughout the interview, Individual 2 expressed concern about Individual 1, pleading with law enforcement not to charge Individual 1.

Law enforcement transported Individual 1 and Individual 2 to the Drug Enforcement Agency (DEA) office to wait until it was time to deliver the drugs. During that time, Officer Davis prepared an anticipatory search warrant for Johnson's residence. As questions came up about the usual procedure for delivering the drugs to Johnson, officers talked further with Individual 1 and Individual 2. Individual 2 primarily answered the officers' questions, but Individual 1, sitting in the same room, did not disagree with anything Individual 2 said. Individual 2 stated that they normally delivered

6

the drugs to Johnson around 8:30 p.m. the day they arrived. Individual 2 said that when they got to the apartment complex, they called Johnson to let them into the main building door, which required a code for access. Johnson would come and open the door for them, and then they would walk down the hallway to Johnson's apartment. Individual 2 indicated that they paid Johnson incrementally for the methamphetamine they were fronted, noting they owed him $10,000. Law enforcement decided that in addition to bringing Johnson the drugs (some of it replaced with a fake substance), Individuals 1 and 2 would also bring him $500, since they were short the last time they saw Johnson and bringing him money would be within the norm of their usual transactions. The senior DEA agent in charge of warrant execution, Mark Minten, briefed Individuals 1 and 2, telling them that Individual 2 would be wearing a wire and that Individual 2 should let law enforcement know when they delivered the package by speaking to Johnson in coded language (e.g., by telling Johnson they had brought "the product he liked," meaning cocaine).

The court granted an anticipatory search warrant based on Officer Davis's affidavit. Doc. 186-2. The affidavit set forth the information about the delivery of the package earlier on August 28 and what officers had learned from their interviews with Individual 1 and Individual 2. *Id.* It did not include any information about SOI, the August 2 delivery, or law enforcement's confirmation of Johnson's residence through public-records databases. *Id.* The affidavit stated "both subjects said they were approached by Melroy Johnson Sr. to receive packages containing methamphetamine." *Id.* It further provided "[Individual 1] and [Individual 2] stated" that Johnson would call Individual 2 to let Individual 2 know when to expect a package.[5] *Id.* The affidavit goes on to set forth Individual 1 and Individual 2's usual practice upon receiving a package: that they kept a pound of methamphetamine to sell, that Individual 2 called Johnson and

---

[5] It is unclear whether Individual 2 provided this information during the initial interview at the residence or at the DEA office; Individual 1 did not provide this information during Individual 1's interview at the residence.

said, "I've got your shoes"; that they took separate vehicles to Johnson's apartment; and that they called Johnson when they arrived so he could let them into the main door of the apartment building and then into his apartment. *Id.*

The warrant affidavit indicated that Individual 1 and Individual 2 would deliver methamphetamine to Johnson at his apartment that evening "in accordance with their previous practice as described above." *Id.* It noted they would be equipped with electronic devices "with instructions to notify law enforcement by code upon their entrance into" Johnson's apartment. *Id.* The affidavit concluded by requesting an anticipatory search warrant "granting search" of Johnson's apartment "upon delivery of the package" to the apartment. *Id.*

The search warrant issued, granting search of Johnson's apartment as soon as the condition precedent occurred. The correct address was listed in the warrant application and throughout the affidavit, but the warrant itself listed two different addresses: it authorized the search of the correct address, but only after "[t]he delivery of the subject package of methamphetamine" to an incorrect address "confirmed by use of coded language when the package actually enters the subject apartment." *Id.* The incorrect address listed in the condition precedent is clearly a typographical error: the incorrect address does not exist, and it consists of the same street name and apartment number as the correct address, but lists the wrong street number, flipping the first two digits of the correct street address so that 4325 (the correct number) becomes 3425 (the incorrect number).

The execution of the search warrant did not go according to plan. Individual 2 called Johnson prior to leaving the DEA office to let him know they were on the way with the "shoes." As they arrived, Johnson called Individual 2, asking where they were. When Individuals 1 and 2 walked up to Johnson's apartment, he was outside on his patio. Rather than letting them in through the main door to the building (and then into his apartment), he let them directly into his apartment through the sliding glass door in his patio area. Meanwhile, Inspector Brandt, on the entry team, attempted to open the main

8

building door using the security code law enforcement had obtained from management at the apartment complex. The code did not work. Some members of the entry team, including Woodbury County Sheriff's Deputy Todd Peterson, moved to the sliding glass door. The door was locked. Deputy Peterson saw Johnson through the blinds, bent over the kitchen counter, looking at something, while Individual 1 and Individual 2 sat in the living room.

With the entry team at the ready, Officer Davis and Agent Minten sat in the parking lot listening to the wire on Individual 2. Officer Davis testified that they were listening for the "coded language" from Individual 1 and Individual 2 acknowledging the drugs were in the apartment. Specifically, Officer Davis testified that they were listening for Individual 2 to ask Johnson to confirm that the product was "right" (in amount and quality) and to tell Johnson they brought money since they were short last time. Agent Minten stated he heard the language, and he radioed law enforcement to execute the warrant. Officer Davis testified that although the audio quality was not great, he also heard the "verbiage." Officer Davis further testified that upon listening to the recording of the wire after-the-fact, using headphones to improve his ability to hear, he heard Individual 2 talk about both things they were looking for. Law enforcement used a battering ram to enter the sliding glass door on the patio. They found Johnson in the bathroom with the methamphetamine. He was arrested and taken into custody.

The Government obtained a criminal complaint charging Johnson with conspiracy to distribute a controlled substance. Doc. 2. Johnson was later indicted on the same charge. Doc. 20. On September 9, 2019, a retained attorney entered an appearance on Johnson's behalf, and on September 19, 2019, the trial management order issued, setting the pretrial-motions deadline for October 16, 2019. Docs. 13, 29. The pretrial-motions deadline was continued on three occasions based on outstanding discovery and the need for defense counsel to review that discovery once disclosed. Docs. 45, 88, 101. The deadline finally expired on February 14, 2020. Doc. 101. Johnson elected to proceed to trial, but the court continued trial on several occasions due to the COVID-19 pandemic

(without extending the pretrial-motions deadline). Docs. 109, 113, 116, 129, 136. On July 31, 2020, less than two weeks before Johnson's scheduled trial, retained counsel moved to continue trial based on the face-mask requirements imposed due to the pandemic. Doc. 152. The court denied the request for a continuance. Doc. 153. A few days later, counsel moved to withdraw his representation, indicating that Johnson had terminated him. Doc. 155. The court granted the motion to withdraw, continued trial, and appointed current counsel on August 4, 2020. Docs. 155-157. On August 13, 2020, current counsel moved to continue trial and to reset the pretrial-motions deadline, noting that he needed time to review the voluminous discovery record. Doc. 169. The Government did not resist a trial continuance, but no position was noted with regard to resetting the pretrial-motions deadline. *Id.* The court granted the motion, resetting the pretrial-motions deadline to August 27, 2020. Doc. 171. Defendant filed the motion to suppress within that new deadline. Doc. 185.

I held a hearing on the suppression motion on October 14, 2020. Doc. 214. At the hearing, the following witnesses testified:

- Inspector Brandt;
- Officer Davis; and
- Deputy Peterson.

I also admitted the following exhibits into evidence (the defense exhibits under seal):

- Defendant's Exhibit A (audio recording of Individual 1's interview);
- Defendant's Exhibit B (audio recording of portions of Individual 2's interview);
- Defendant's Exhibit C (search warrant materials) (Doc. 186-2);
- Defendant's Exhibit D (police report summary of Individual 1's interview) (Doc. 186-3); and
- Government's Exhibit 1 (picture of Johnson that Inspector Brandt showed to Individual 1 during interview) (Doc. 219).

After the hearing, the parties obtained the transcript and submitted written argument on October 26 and November 2. Docs. 226, 229. The Government offered an additional

exhibit without objection from Defendant (the search warrant materials for the McDonald Street house). *See* Doc. 229-1. I now admit Government's Exhibit 2 under seal.

## II.   EXTENSION OF PRETRIAL-MOTION DEADLINE

The Government argues that this court should not have granted Defendant's prior motion to reset the pretrial-motions deadline after it expired in February 2020. Federal Rule of Criminal Procedure 12(c) provides:

> **(1) Setting the Deadline.** The court may, at the arraignment or as soon afterward as practicable, set a deadline for the parties to make pretrial motions . . . .
> **(2) Extending or Resetting the Deadline.** At any time before trial, the court may extend or reset the deadline for pretrial motions.
> **(3) Consequences of Not Making a Timely [Pretrial Motion].** If a party does not meet the deadline for making a [pretrial] motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause.

"Good cause" is "a flexible standard that requires consideration of all interests in the particular case." **Fed. R. Crim. P. 12(c) advisory committee note to the 2014 amendments**. The Eighth Circuit has recognized that "[t]he absence of prejudice or delay in the trial may be relevant." *United States v. Trobee*, 551 F.3d 835, 838 (8th Cir. 2009). The determination of the existence of good cause is a matter left to the district court's discretion. *See id.* at 837-38.

Here, I found good cause to reset the pretrial-motions deadline based on current counsel's recent appearance in the case. Docs. 169, 171. The Government did not appeal my order within fourteen days, as required by Federal Rule of Criminal Procedure 59(a) and Local Criminal Rule 59. Accordingly, the Government has waived the right to challenge my order resetting deadlines. **Fed. R. Crim. P. 59(a)**. In any event, I recognize that I likely could have denied the motion to reset deadlines,[6] but I do not

---

[6] *See United States v. Trancheff*, 633 F.3d 696, 697-98 (8th Cir. 2011) (per curiam) (no abuse of discretion in denying motion to extend pretrial-motions deadline four years after it expired

believe that I abused my discretion or committed clear error in granting the extension, and the Government has pointed to no case indicating otherwise.

## III.    MOTION TO SUPPRESS

Johnson makes three arguments challenging the search of his apartment.  First, he argues that the warrant affidavit does not establish probable cause on its face because it contains no information to assess the reliability of Individual 1 and Individual 2.  Second, he argues that the warrant affidavit contains misstatements and material omissions that, if included, destroy the existence of probable cause.  Finally, he argues that the condition precedent to the anticipatory search warrant did not occur, and therefore, the search of Johnson's residence was invalid.

### A. Probable Cause on the Face of the Affidavit

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no [w]arrants shall issue, but upon probable cause . . . ."  **U.S. Const. amend. IV**.  Probable cause exists when, "under the totality of circumstances, there is a fair probability [that] evidence of a crime will be found in a particular place" or that the requested search will "lead to the discovery of evidence."  ***United States v. Faulkner***, 826 F.3d 1139, 1144, 1146 (8th Cir. 2016).  "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, [the Eighth Circuit] has also recognized that law enforcement officers may make reasonable inferences . . . .'"  ***United States v. Brackett***,

---

when defendant absconded during that four-year period and new counsel was appointed upon his re-arrest—the court noted defendant caused the delay, and prior counsel could have filed a pretrial motion within the original deadline); ***United States v. Salgado-Campos***, 442 F.3d 684, 686 (8th Cir. 2006) (no abuse of discretion in denying motion to extend pretrial-motions deadline filed three months after deadline expired and two months after retained counsel entered appearance).

846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)). A judge may issue an anticipatory search warrant, which requires the judge "to determine (1) that it is now probable that (2) contraband, evidence of a crime, or a fugitive will be on the described premises (3) when the warrant is executed." *United States v. Brown*, 929 F.3d 1030, 1037 (8th Cir. 2019) (quoting *United States v. Grubbs*, 547 U.S. 90, 96 (2006)), *cert. denied,* 140 S. Ct. 830 (2020). "Most anticipatory warrants subject their execution to some condition precedent other than the mere passage of time—a so-called 'triggering condition.'" *Grubbs*, 547 U.S. at 94. For probable cause to exist for the issuance of an anticipatory search warrant, there must be a fair probability both "that contraband or evidence will be found in a particular place" if the triggering condition occurs and that "the triggering condition will occur." *Id.* at 96-97. As with all warrants, in accordance with "[t]he Fourth Amendment's strong preference for searches conducted pursuant to a warrant," "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review"; "the duty of a reviewing court is simply to ensure that the [issuing judge] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 236, 238-39 (1983) (last alteration in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)); *accord Brown*, 929 F.3d at 1037.

Johnson argues that the affidavit fails to establish probable cause on its face because no information establishes the reliability of the information provided by Individual 1 and Individual 2. *See United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) ("When the affidavit is based on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant to whether the affidavit provided probable cause to support the search."). Johnson cites to cases discussing probable cause based on an anonymous tip or statements from persons whose identities are unknown to law enforcement. *See Recznik v. City of Lorain*, 393 U.S. 166, 169 (1968) (per curiam); *United States v. Wells*, 223 F.3d 835, 839-40 (8th Cir. 2000). Statements from known informants, however, are analyzed differently than

13

statements from unknown sources. *See United States v. Nolen*, 536 F.3d 834, 839-40 (8th Cir. 2008).

Johnson also points to *United States v. Little*, 735 F.2d 1049 (8th Cir. 1984). In that case, confidential informants told police officers that the defendant and other coconspirators had purchased a plane and were using it to smuggle drugs from the Caribbean. *Id.* at 1054-55. The court held that the confidential informants' information did not establish probable cause because law enforcement did not corroborate the information—for example, by confirming that the plane had taken international flights or that the plane had been modified as the confidential informants stated. *Id.* at 1055.

The affidavit here is entirely distinguishable from *Little*. "[S]ince the police had already seized [drugs] from [Individual 1 and Individual 2], the question was not whether a crime was being committed," as in *Little*, "but only where and by whom." *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986). In *Little*, it was not clear how the confidential informants knew the information they relayed to law enforcement; here, Individuals 1 and 2 "obviously had firsthand knowledge of the facts they provided, and their identities and the bases of their knowledge were made clear in the affidavit." *Id.* In addition, here, Individuals 1 and 2 had been caught in possession of distribution quantities of methamphetamine and "made statements against penal interest by admitting past and current drug dealings," providing some indicia of reliability. *Id.* As the Eighth Circuit noted in *Reivich*, "[o]ne who knows the police are already in a position to charge him with a serious crime will not likely undertake to divert the police down blind alleys." *Id.* at 960 (quoting *United States v. Davis,* 617 F.2d 677, 693 (D.C. Cir. 1979)). Further, the affidavit indicates that Individual 1's and Individual 2's statements corroborated each other—both stated the package was intended for Johnson, who lived in the Woodbury Heights apartment complex; and both admitted receiving prior packages (Doc. 186-2).[7] *See id.* (that "the affidavit suggested . . . [the two informants]

---

[7] The affidavit suggested Individuals 1 and 2 made additional statements consistent with the

independently told consistent stories" provided some corroboration to their statements). Moreover, corroboration of Individuals 1 and 2's information would occur by nature of the anticipatory warrant, once the condition precedent occurred as Individuals 1 and 2 stated it would (i.e., Johnson let them into his apartment in Woodbury Heights with the package). A substantial basis existed for the court to determine probable cause existed on the face of the warrant affidavit. *See United States v. Allen*, 297 F.3d 790, 793-94 (8th Cir. 2002) (upholding warrant based primarily on informant's statements against penal interest made after a traffic stop in which law enforcement found materials used to manufacture methamphetamine when informant implicated defendant in a drug conspiracy, and police verified that address given by informant belonged to defendant and that defendant owned a black van as informant stated); *Reivich*, 793 F.2d at 959-60 (upholding warrant search of defendant's residence when officers arrested two people on drug charges after finding cocaine in their car; the individuals gave separate statements to police identifying the defendant as the source of the drugs, his telephone number, and the general location of his residence; both indicated defendant obtained the drugs in Florida; police matched the provided phone number to an address in the area the arrestees had said defendant lived; and a car in the driveway at that address was registered to defendant). I recommend finding that the warrant affidavit was not invalid on its face.

### B. False Statements and Omissions in the Affidavit

When a judge issues a search warrant based "on an affidavit containing false or omitted statements, the resulting search warrant may be invalid." *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007). To invalidate the warrant, the defendant must show, by a preponderance of evidence, (1) that law enforcement acted intentionally or with reckless disregard in making the false statement or material omissions, and (2) that the affidavit would not support a finding of probable cause if the false statements

---

other's story, which will be discussed further in the next section.

were left out of, or the material omissions were included in, the affidavit. *Id.* This standard comes from the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154 (1978).

To be entitled to a *Franks* hearing, "a defendant must make a substantial preliminary showing that includes 'allegations of deliberate falsehood or of reckless disregard for the truth.'" *Williams*, 477 F.3d at 557 (quoting *Franks*, 438 U.S. at 171). "This substantiality requirement is not met lightly and requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements." *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015). This requirement is based on "a presumption of validity with respect to the affidavit supporting the search warrant." *Williams*, 477 F.3d at 558. "Because a warrant application need only show facts establishing probable cause, reckless disregard for the truth may be inferred from the omission of information from an affidavit only when the material omitted would have been clearly critical to the finding of probable cause." *United States v. Carnahan*, 684 F.3d 732, 735 (8th Cir. 2012) (cleaned up). Put another way, the defendant must show that probable cause would not have existed if the false information had been omitted from the affidavit, or if the omitted information had been included in the affidavit. *See Gonzalez*, 781 F.3d at 431. If the affidavit would still provide probable cause to issue a search warrant, the defendant fails to make the necessary preliminary showing for a *Franks* hearing. *Id.*; *see also United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013).

Johnson challenges the truthfulness of two statements in the affidavit: (1) "that both subjects said they were approached by Melroy Johnson Sr. to receive packages containing methamphetamine" and (2) that "[Individual 1] and [Individual 2] stated Melroy calls [Individual 2] to give notice that a package is arriving" (and subsequent statements in the affidavit suggesting the information came from both interviews). Doc. 186-2. Johnson also argues the affidavit should have disclosed (1) Individual 2's criminal history, which included a felony drug conviction; (2) that law enforcement conducted

16

surveillance on August 2 and did not observe Individuals 1 or 2 meeting with Johnson after receiving a suspicious package; (3) that Individuals 1 and 2 were in a romantic relationship; and (4) that law enforcement planned for Individual 2 to bring $500 to Johnson along with the delivery of the package. I granted Johnson a *Franks* hearing based on the audio recordings of Individual 1's and Individual 2's interviews.

After receiving all the evidence at the suppression hearing, however, a preponderance of the evidence does not establish a *Franks* violation. I agree with Defendant that the statements in the affidavit are misleading. Neither Individual 1 nor Individual 2 provided law enforcement with Defendant's full name, instead identifying him by description, nickname, and picture, which was additionally corroborated by Individuals 1 and 2's statements that the person they described lived in the Woodbury Heights apartment complex, where officers knew Johnson resided. If both Individuals 1 and 2 had independently described the intended recipient of the package (by nickname or otherwise) and then confirmed his identity by picture, perhaps officers could "reasonably infer" the statement in the affidavit that "both subjects said" the intended recipient of the package was "Melroy Johnson Sr." ***Cf. United States v. Thompson***, 210 F.3d 855, 860 (8th Cir. 2000) (upholding search warrant for storage unit when affidavit stated defendant's 1992 white Dodge minivan was located therein; the court held officers could "reasonably infer" defendant's minivan was in the storage unit based on a witness stating he saw defendant park a "white minivan" in the storage unit two weeks prior, and the manager of the storage unit confirmed a "vehicle" was inside the storage unit). But Individual 2 did not identify the intended recipient of the package—by nickname or otherwise—until law enforcement showed Individual 2 a picture of Johnson (and another man) and said they already knew the photo depicted the intended recipient of the package. Similarly, Individual 1 only knew Johnson by the nickname Arkansas (which corresponded to mailing addresses for Johnson in that state). Although Individual 1 identified Johnson by photo, this identification was highly suggestive, calling into question its reliability: Inspector Brandt showed Individual 1 a picture cropped to feature

17

only Johnson, despite the availability of the original photograph depicting two Black men, and despite Individual 1 saying all Black men looked alike. Under these circumstances, the affidavit should have included more specifics about Individuals 1 and 2's identifications of Johnson, rather than suggesting they both named "Melroy Johnson Sr." as the intended recipient of the package without prompting.

The affidavit also should have made clear what information came from Individual 1's interview, what information came from Individual 2's interview, and what information came from them both. I agree with Defendant that the affidavit is somewhat misleading, as it makes it seem like Individual 1 and Individual 2 corroborated every aspect of each other's stories in separate interviews. The affidavit states "[Individual 1] and [Individual 2] stated [Johnson] calls [Individual 2] to give notice that a package is arriving," but only Individual 2 provided this information upon initial interview. The affidavit goes on to set forth information taken from Individual 2's initial interview—that Johnson called Individual 2 before a package was expected; that Individuals 1 and 2 opened the package, kept a pound of methamphetamine, and later paid Johnson $6,000 for the drugs; and that Individual 2 called Johnson to say, "I've got your shoes" before delivery. Individual 1 did not provide any of this information during the initial interview—indeed, Individual 1 denied being involved in opening the package or collecting any sort of payment for receiving the package on Johnson's behalf. The affidavit does not specify the source of this information, but preceding sentences set forth facts learned from both Individual 1 and Individual 2, and I agree with Defendant that this structure makes it seem like the affidavit continued to set forth information provided by both individuals, suggesting their statements corroborated each other's. I note that Individual 1 did corroborate some aspects of Individual 2's statements, however: both stated Johnson approached Individual 2 through the television-repair business; both stated they had received one or two prior packages on Johnson's behalf; and both stated they

delivered prior packages to Johnson at his residence in the Woodbury Heights apartment complex.[8]

Ultimately, I do not find that law enforcement acted intentionally or with reckless disregard for the truth in drafting the affidavit to include the misleading statements. The affidavit is sloppy. It omits a lot of information relevant to probable cause—including facts bolstering the existence of probable cause, such as the information from SOI or that public records confirmed where Johnson lived. Law enforcement were on a time crunch to complete the affidavit, since they did not search Individuals 1 and 2's residence until around 4:00 p.m., and they wanted to obtain the search warrant before Individuals 1 and 2 delivered the package to Johnson at their usual time, around 8:30 p.m. It appears that to save time, officers summarized the information learned from Individuals 1 and 2 without distinction and omitted the circumstances under which Individuals 1 and 2 identified Defendant as the recipient of the package. Even if the affidavit had corrected the misleading statements and set forth the facts in better detail, the affidavit would have established the existence of probable cause. Here, law enforcement knew much more information than contained in the affidavit, and they clearly had probable cause for the issuance of the warrant. At most, law enforcement acted negligently in drafting the warrant, and "[i]naccurate statements that result from negligence . . . are insufficient to trigger relief under *Franks*." **United States v. Stevens**, 530 F.3d 714, 718 (8th Cir. 2008).

---

[8] Individual 1 also ultimately identified Johnson by photo, but as noted above, I question the reliability of this identification. Even without it, however, Individual 1's description of the intended recipient of the package as a Black man in his mid40s who lived in the Woodbury Heights apartment complex provided some corroboration of Individual 2's identification. Individuals 1 and 2 also provided additional information while at the DEA office together, but at most, it seems Individual 1 merely agreed with things Individual 2 said, rather than separately volunteering information in a manner corroborating Individual 2's statements.

Similarly, I do not find that law enforcement acted with the requisite mens rea in omitting the information about Individual 2's criminal history, the August 2 surveillance,[9] Individuals 1 and 2's romantic relationship, and the plan for Individual 2 to bring Johnson $500. As noted, the affidavit omitted a lot of information—more supporting probable cause than detracting from it. In addition, the omitted information was not critical to a probable-cause finding. Even if it had been included in the affidavit, the affidavit would still have established probable cause.

The case relied upon by Defendant, *United States v. Simmons*, 771 F. Supp. 2d 908 (N.D. Ill. 2011), is distinguishable. In that case, the affidavit stated law enforcement learned through a "conversation" with a confidential informant (CI) that the defendant was a felon and that the CI had seen firearms at the defendant's residence, which the defendant told the CI he kept for protection. *Id.* at 914. Law enforcement did not corroborate the CI's information in any meaningful way: they verified that the defendant was a felon through his arrest history; they showed the CI pictures of the defendant and the defendant's residence, which the CI confirmed were the person and residence he was talking about; and they drove the CI by the defendant's residence to point it out. *Id.* at 913. In addition, law enforcement omitted from the affidavit that the CI provided this information because he was under arrest and believed he would be charged with drug possession. *Id.* at 913-14. The affidavit also failed to mention the CI's extensive criminal history, which included gang affiliation and giving a false name to police upon arrest. *Id.* The court held that "given the weak police corroboration of the CI's statement and the absence of any other indicia of reliability of the CI and his statement, the omission of these facts was material." *Id.* at 917. Here, law enforcement did not omit from the affidavit that Individuals 1 and 2 provided information to help reduce their potential

---

[9] Defendant assigns greater significance to the results of the August 2 surveillance than I find warranted. Although law enforcement did not observe Individuals 1 and 2 meet with Johnson or travel to the Woodbury Heights apartment complex, it is not clear that they continued to conduct surveillance until 8:30 p.m., when Individuals 1 and 2 normally delivered the packages to Johnson.

criminal charges and sentence. And although the affidavit did not include that Individual 1 had a prior felony drug conviction, Individual 1's criminal history was not extensive and did not include lying to police, like the CI in *Simmons*. In addition, here, there was much greater corroboration of Individual 1 and Individual 2's statements, law enforcement only had a small window within which to prepare the affidavit, and law enforcement also omitted information supporting the existence of probable cause. The facts here differ significantly from the facts in *Simmons*.

I recommend rejecting Defendant's *Franks* argument.


### C. Execution of the Search Warrant

"If an anticipatory warrant is executed before the triggering event occurs, 'then suppression may well be warranted for that reason.'" **Brown**, 929 F.3d at 1038 (quoting **United States v. Tagbering**, 985 F.2d 946, 950 (8th Cir. 1993)). Here, the affidavit in support of the warrant concluded:

> On August 28, 2019, law enforcement intends to deliver a package with an amount of methamphetamine by [Individuals 1 and 2] to [Johnson at his Sioux City apartment] in accordance with their previous practice as described above. [Individuals 1 and 2] will be equipped with an electronic recording and communication device with instructions to notify law enforcement by code upon their entrance into [Johnson's] apartment . . . . The undersigned requests an anticipatory search warrant granting search of [Johnson's] apartment upon delivery of the package to [Johnson's] apartment.

Doc. 186-2. The warrant itself authorized the search of Johnson's apartment upon delivery of the package "confirmed by use of coded language when the package actually enters the subject apartment." Doc. 186-2. The incorrect address is listed in the section of the warrant discussing the condition precedent, the result of a typo writing Johnson's address. *Id.*

Defendant argues that coded language was not used to confirm the package's entry into the apartment. I disagree. Although no "code word" was used, Officer Davis

testified that law enforcement instructed Individuals 1 and 2 to discuss the delivery of the package by asking Johnson to confirm that the product was "right" and by saying they brought money to make up for the shortage on the last delivery—and that this was the "coded language" referred to in the affidavit. Officer Davis testified that both he and Agent Minten heard this coded language confirming the delivery of the package. He further testified that the coded language can be heard on the audio recording of the wire (which is not in evidence). In addition, law enforcement knew that the package had entered Johnson's apartment because they watched Individuals 1 and 2 enter directly into Johnson's apartment from the patio door, rather than entering the security door to a common area of the apartment building. And Deputy Peterson saw through the blinds that Individuals 1 and 2 were sitting on the couch while Johnson looked at something on the kitchen counter, observations consistent with Individuals 1 and 2 having given the package to Johnson.

Defendant also argues that the condition precedent did not occur because the package never entered the nonexistent address listed in the condition-precedent section of the warrant. The address listed in the condition-precedent section was clearly a typo, created by inverting the first and second digits of the correct four-digit address number. The Eighth Circuit has upheld a search warrant listing the wrong address when "[t]he address stated in the warrant does not exist, making the mistaken search of the wrong premises unlikely;" "the agents executing the warrant personally knew which premises were intended to be searched"; and "[t]he premises which were intended to be search were, in fact, those actually searched." *United States v. Gitcho*, 601 F.2d 369, 372 (8th Cir. 1979); *see also United States v. Thurman*, 625 F.3d 1053, 1057 (8th Cir. 2010) (upholding search when warrant described the house to be searched and location of the house, but listed the wrong street number); *United States v. Clement*, 747 F.2d 460, 461 (8th Cir. 1984) (upholding search when warrant listed wrong apartment number, but there was no probability of mistake because the officers knew which apartment belonged to the target of the investigation). Here, law enforcement knew the condition precedent

was intended to require the package to enter the residence to be searched, not a different residence; the address listed in the condition precedent did not exist; the correct address was used throughout the affidavit and on the section of the warrant describing the place to be searched; and the package entered, and officers searched, the intended address. Under these circumstances, the typo in the search warrant does not invalidate the warrant.

Finally, Defendant argues that additional triggering events set forth in the affidavit (as opposed to the warrant itself) failed to occur. The affidavit indicated Individuals 1 and 2 would deliver the package "in accordance with their previous practice" described in the affidavit. Defendant suggests that Individual 2 did not call Johnson to say, "I've got your shoes," but the testimony at the hearing establishes that Individual 2 called Johnson to deliver this message prior to leaving the DEA office. Defendant also notes Individual 2 did not call Johnson upon arrival to the apartment complex, and Johnson did not let Individuals 1 and 2 into the building through the apartment complex security door (as set forth in the affidavit as their prior practice). Instead, Johnson called Individual 2 as they arrived (negating the need for Individual 2 to call Johnson), and Johnson let Individuals 1 and 2 into his apartment through the patio door.

In *Brown*, the defendant argued that the warrant was improperly executed because a triggering event listed in the affidavit, but not the warrant itself, did not occur. 929 F.3d at 1038. The affidavit stated law enforcement would deliver the package "only to an adult willing to accept delivery on behalf of [the person] to whom the Subject Parcel is addressed." *Id.* at 1035. The warrant itself, however, stated probable cause to search the residence "would be established once '[a]n adult subject transport[ed] some or all of the methamphetamine inside the target address." *Id.* (alterations in original). During the attempted delivery of the package, nobody answered the door, and the officer posing as a postal employee did not deliver the package to an adult, instead leaving it on the porch. *Id.* Thirty minutes later, the package was brought inside the residence. *Id.* Within two minutes, it was returned to the porch. *Id.* Officers executed the warrant, discovering after-the-fact that "return to sender" had been written on the package. *Id.*

23

The court held that even if the defendant was "correct that the triggering event did not occur, suppression of the search results [wa]s unwarranted" under the *Leon*[10] good-faith exception. *Id.* at 1038. The court found the officers reasonably relied on the warrant. *Id.* The court noted the triggering condition listed in "the warrant itself only specified transportation of the methamphetamine inside the residence—an act which all parties agree occurred." *Id.* The court also noted the officers observed suspicious behavior—someone opening the door to look at the package several times before it was taken inside, and someone else driving by the house as if conducting countersurveillance—"strengthening their belief that they had probable cause to execute the warrant." *Id.* at 1035, 1038.

Here, as in *Brown*, the execution of the search warrant does not require suppression. Although Individual 2 did not call Johnson upon arrival to the apartment, that is because Johnson called Individual 2 as they pulled up. And although Johnson did not let Individuals 1 and 2 into the main security door, he let them directly into his apartment through the patio door. Through Johnson's actions, the officers could still corroborate the information Individuals 1 and 2 provided (i.e., that Johnson was expecting them), and they could see the package of methamphetamine enter Johnson's apartment. The condition precedent listed in the warrant itself required only the delivery of the package, confirmed by coded language, which occurred. And the events that unfolded a little differently than Individuals 1 and 2 had described—Johnson calling and letting them in through the patio door—are not so significant that officers unreasonably relied on the warrant, despite the affidavit stating the package would be delivered "in accordance with their prior practice." I recommend finding that the good-faith exception applies and that suppression is not appropriate.

---

[10] *United States v. Leon*, 468 U.S. 897 (1984).

## IV.   CONCLUSION

I respectfully recommend that the district court **deny** Defendant's motion to suppress evidence (Doc. 185).

Objections to this Report and Recommendation, in accordance with Federal Rule of Criminal Procedure 59(b), **must be filed within ten days** of the service of a copy of this Report and Recommendation; any response to the objections **must be filed within seven days** after service of the objections.  *See also* 28 U.S.C. § 636(b)(1), LCrR 59. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. **LCrR 59**.  Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* **Fed. R. Crim. P. 59**.  Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.  *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**ENTERED** this 10th day of November, 2020.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa