# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

MELROY JOHNSON, SR.,

          Defendant.

No. CR19-4065-LTS

**MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION**

_____

This matter is before me on a Report and Recommendation (R&R) in which Chief United States Magistrate Judge Kelly K.E. Mahoney recommends that I deny defendant's motion (Doc. 185) to suppress. Doc. 245. Defendant Melroy Johnson, Sr., has filed timely objections (Doc. 251) to the R&R and the Government has submitted an untimely[1] response (Doc. 259).

## I.    BACKGROUND

### A.   *Procedural History*

On August 12, 2020, the Grand Jury returned a superseding indictment[2] charging Johnson with conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§

---

[1] Because trial was imminent when the R&R was filed, Judge Mahoney ordered that any objections to the R&R be filed within 10 days and any response be filed seven days later. *See* Doc. 245 at 25. The objections were filed on November 20, 2020, meaning the response was due November 27, 2020. The Government did not file its response until December 4, 2020. While it requested and received (Docs. 257, 258) an extension of time to file a reply with regard to another motion pending in this case, it did not request an extension of time to file a response to the objections. Because the response is untimely, I have not considered it.

[2] A criminal complaint (Doc. 2) was filed against Johnson on August 29, 2019. On September 17, 2019, the Grand Jury returned an Indictment against Johnson and co-defendants. Doc. 20.

841(a)(1), 841(b)(1)(A), 846 and 851; possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 851; and possession with intent to distribute a controlled substance and aiding and abetting the possession with intent to distribute in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 851.

Johnson filed his motion (Doc. 185) to suppress on August 27, 2020,[3] and the Government filed its resistance (Doc. 195) on September 14, 2020. Judge Mahoney held a hearing on October 14, 2020. *See* Doc. 214. The Government presented testimony from Postal Inspector Ryan Brandt, Sioux City Police Officer Eric Davis and Woodbury County Sheriff's Deputy Todd Peterson. *Id.* Judge Mahoney admitted Government Exhibit 1 and Defense Exhibits A through D. *Id.* The parties then submitted post-hearing briefs. Docs. 226, 229.

Judge Mahoney issued her R&R (Doc. 245) on November 10, 2020. Johnson filed his objections (Doc. 251) on November 20, 2020. Trial was set to begin December 14, 2020, but the parties agreed to a continuance to February 16, 2021, due to ongoing COVID-19 concerns. *See* Doc. 255.

**B.    *Relevant Facts*[4]**

Judge Mahoney provided the following factual background in her R&R:

In early June 2019, Postal Inspector Ryan Brandt became suspicious about packages being mailed to a Sioux City address from

---

[3] Johnson sought a continuance of the pretrial motions deadline on three occasions based on outstanding discovery and his retained counsel's need to review that discovery. *See* Docs. 45, 88, 101. He was scheduled to proceed to trial in early 2020, but due to the COVID-19 pandemic, his trial was continued on several occasions. *See* Docs. 109, 113, 116, 129, 136. Less than two weeks before his scheduled trial on July 31, 2020, Johnson fired his retained attorney. Doc. 155. Johnson's current counsel was then appointed (Docs. 155 to 157) and moved to continue trial and reset the pretrial motions deadline, which was granted. Docs. 169, 171.

[4] Johnson asserts two objections to Judge Mahoney's factual findings. Those objections will be addressed below.

2

Orange, California, using a fictitious return address. Along with Sioux City Police Officer Eric Davis, assigned to the Tri- State Drug Task Force, Inspector Brandt conducted a "knock and talk" at the delivery address listed on these packages, where the officers encountered a person I will refer to as Source of Information ("SOI"). SOI consented to the search of the package, which revealed about five pounds of methamphetamine. SOI told the officers that the package was intended for Melroy Johnson and that SOI had received six previous packages on his behalf, mailed by Felton Fitzgerald in California. SOI said that SOI delivered the packages to Johnson, and in return, he gave SOI money and crack cocaine for personal use. SOI also told the officers that Johnson sometimes gave SOI envelopes to mail to California, which SOI believed contained money. SOI refused to deliver the package to Johnson.

Officer Davis remained in contact with SOI as the investigation continued. When SOI first named "Melroy Johnson" as the intended recipient, Officer Davis thought SOI meant Melroy Johnson, Jr. When he discovered two Melroy Johnsons living in the Sioux City area—Jr. and Sr.—Officer Davis returned to SOI, who clarified that Melroy Johnson, Sr., received the packages. Officer Davis also learned through follow-up contact with SOI that SOI delivered the packages to Johnson's apartment. SOI provided Johnson's address in the Woodbury Heights apartment complex, and Officer Davis confirmed that Johnson lived there through utilities bills and the CLEAR database. SOI also indicated that other people in the Sioux City area received packages for Johnson, but SOI did not know their identities.

After learning about others' involvement, in late July, Inspector Brandt began looking at all packages mailed from Orange, California, to the Sioux City area. On August 2, he identified a package addressed to a residence in the 2100 block of McDonald Street as suspicious, because its approximate weight and handwritten label in marker were similar to the package delivered to SOI that contained methamphetamine. Officer Davis, along with others, conducted surveillance of the package's delivery on August 2. They observed a person (later identified as Individual 1) approach the postal employee and claim the package. Individual 1 took the package and went into a nearby duplex with a different address than the one on the package. Law enforcement did not see which residence of the duplex Individual 1 entered. A little more than an hour later, Individual 1 left with another person (later identified as Individual 2). Law enforcement followed them to a television-repair business. Both went inside, but Individual 1

3

returned to the duplex after about twenty to thirty minutes, while Individual 2 stayed at the business. Law enforcement continued surveilling both individuals at the duplex and at the business, but they did not see anything further. In all, they watched them for five and a half to six hours after the delivery of the package.

Inspector Brandt identified another suspicious package on August 27, from Vista, California, to the 2100 block of McDonald Street (but a different address than the August 2 package). *See* Doc. 186-2. It weighed twelve pounds and listed both a sender's name and recipient's name not associated with the listed addresses. *Id.* After a K-9 alert on the package the next day, Inspector Brandt obtained a warrant to search the package. *Id.* The search revealed a stereo speaker and two purses containing pound quantities of methamphetamine.

Inspector Brandt repackaged the stereo and drugs and, posing as a letter carrier, delivered the package around 2:00 p.m. on August 28. A woman was sitting outside the residence, and he asked if she was expecting a package. When she did not respond, he set the package down and walked away. Before he reached the mail truck, he heard Individual 1 yelling at him that the package belonged to Individual 1, and he saw Individual 1 retrieve the package and take it into the duplex next door. Because the law enforcement team conducting surveillance did not see which door of the duplex Individual 1 entered, an officer knocked on one of the doors under a ruse, and law enforcement confirmed the target residence when Individual 1 came to answer the door.

Officer Davis obtained a search warrant for the residence Individual 1 had entered with the package. *See* Doc. 229-1. Law enforcement executed the warrant around 4:00 p.m. While other officers searched (ultimately finding methamphetamine and cocaine), Inspector Brandt interviewed Individual 1, and Officer Davis interviewed Individual 2. Individual 1 originally denied any knowledge of the package's contents, saying Individual 1 retrieved the package at Individual 2's direction (the two were in a romantic relationship). When Inspector Brandt indicated he knew they planned to bring the package to a third party, Individual 1 stated Individual 1 did not know the guy's name, but they called him Arkansas. Inspector Brandt asked what Arkansas looked like, and Individual 1 described a Black man in his mid40s or maybe older, noting all Black men looked alike to Individual 1. Individual 1's description matched Johnson, and Inspector Brandt recalled seeing mailing addresses associated with

4

Johnson in Arkansas. Inspector Brandt showed Individual 1 a photograph of Johnson, and Individual 1 agreed that was the person described. Individual 1 stated that the man in the picture had approached Individual 2 at the television-repair business and that Individual 2 had fixed his television and visited his residence a few times. Inspector Brandt asked if Individual 1 would remember the man's name if he said it. Individual 1 said Individual 1 had never heard his real name before. Inspector Brandt asked if the name Melroy Johnson rang a bell, and Individual 1 said the name sounded familiar, suggesting Individual 1 might have seen it on receipts for the business. Individual 1 stated Johnson lived in the Woodbury Heights apartment complex. Individual 1 stated Individual 1 knew where Johnson's apartment was located but did not know the address or apartment number. Individual 1 stated Individual 1 had met Johnson three to four times, visiting his apartment when Individual 2 went to work on the television.

Individual 1 said they had received one prior package, maybe two, which Individual 2 had taken to Johnson. Individual 1 denied knowing what Individual 2 received in exchange but admitted both Individual 1 and Individual 2 used methamphetamine. After Inspector Brandt talked to Officer Davis, he again asked Individual 1 what happened after they received the packages, letting Individual 1 know that Individual 2 was cooperating. Individual 1 stated they went to Woodbury Heights. Inspector Brandt asked if Individual 2 took a Lyft, while Individual 1 followed by car. Individual 1 nodded. Individual 1 indicated willingness to deliver the package to Johnson as planned. Individual 1 noted they planned to go to Woodbury Heights after a child's birthday party, around 8:30 or 9:00 p.m. Throughout the interview, Individual 1 expressed concern about "doing someone else's time," noting Individual 1 had not been in trouble since acquiring a felony drug conviction at age 18.

While Inspector Brandt spoke to Individual 1, Officer Davis talked to Individual 2. Like Individual 1, Individual 2 originally denied any involvement in the drug trade. Individual 2 became willing to talk, however, once Officer Davis indicated that law enforcement already knew Individual 2 was receiving packages of drugs from California and that they knew the ultimate recipient of those drugs, showing Individual 2 a picture of Johnson. The picture showed two Black men. Individual 2 pointed to Johnson in the photo, saying they called him Barbecue; Individual 2 denied knowing the other man. Individual 2 said Individual 2 did not know Barbecue's real name, saying, "It's Mel or...?" Officer Davis cut Individual 2 off, affirming that Mel was correct. Individual 2 said that they had met

5

Johnson through his television-repair business, noting it was like Johnson "knew [they] used" and "tracked [them] down" to receive packages for him. Individual 2 stated they had received two prior packages in addition to the one that day. Individual 2 indicated they would open the package, put the drugs in a different package, and then bring the drugs to Johnson at his apartment, calling beforehand to let him know they were on their way, saying, "I've got your shoes," which was code for methamphetamine. Individual 2 stated Johnson lived in a first-floor apartment in the Woodbury Heights apartment complex. Officer Davis pulled up a map of the Woodbury Heights apartment complex on his phone, and Individual 2 identified Johnson's building. Individual 2 stated that in exchange, they were fronted one pound of methamphetamine to sell, for which they later owed Johnson $6,000. Individual 2 indicated they traveled separately to bring the drugs to Johnson: Individual 2 took the drugs in a Lyft, and Individual 1 picked Individual 2 up from Johnson's apartment. Individual 2 stated that this was the first time the package had contained cocaine, noting Johnson wanted something he liked. The cocaine had been hidden in the speaker, explaining why law enforcement did not find it during their initial search of the package. Individual 2 indicated that they were not the only people who received packages for Johnson. Individual 2 noted Individual 2 had heard about law enforcement's encounter with someone else who received packages for Johnson, and Individual 2 wondered why that person was not in jail (likely referring to SOI). Individual 2 expressed willingness to deliver the package to Johnson but refused to participate without Individual 1, since they both had delivered the packages in the past. Throughout the interview, Individual 2 expressed concern about Individual 1, pleading with law enforcement not to charge Individual 1.

Law enforcement transported Individual 1 and Individual 2 to the Drug Enforcement Agency (DEA) office to wait until it was time to deliver the drugs. During that time, Officer Davis prepared an anticipatory search warrant for Johnson's residence. As questions came up about the usual procedure for delivering the drugs to Johnson, officers talked further with Individual 1 and Individual 2. Individual 2 primarily answered the officers' questions, but Individual 1, sitting in the same room, did not disagree with anything Individual 2 said. Individual 2 stated that they normally delivered the drugs to Johnson around 8:30 p.m. the day they arrived. Individual 2 said that when they got to the apartment complex, they called Johnson to let them into the main building door, which required a code for access. Johnson would come and open the door for them, and then they would walk down the hallway to Johnson's apartment. Individual 2 indicated that they

paid Johnson incrementally for the methamphetamine they were fronted, noting they owed him $10,000. Law enforcement decided that in addition to bringing Johnson the drugs (some of it replaced with a fake substance), Individuals 1 and 2 would also bring him $500, since they were short the last time they saw Johnson and bringing him money would be within the norm of their usual transactions. The senior DEA agent in charge of warrant execution, Mark Minten, briefed Individuals 1 and 2, telling them that Individual 2 would be wearing a wire and that Individual 2 should let law enforcement know when they delivered the package by speaking to Johnson in coded language (e.g., by telling Johnson they had brought "the product he liked," meaning cocaine).

The court granted an anticipatory search warrant based on Officer Davis's affidavit. Doc. 186-2. The affidavit set forth the information about the delivery of the package earlier on August 28 and what officers had learned from their interviews with Individual 1 and Individual 2. *Id.* It did not include any information about SOI, the August 2 delivery, or law enforcement's confirmation of Johnson's residence through public-records databases. *Id.* The affidavit stated "both subjects said they were approached by Melroy Johnson Sr. to receive packages containing methamphetamine." *Id.* It further provided "[Individual 1] and [Individual 2] stated" that Johnson would call Individual 2 to let Individual 2 know when to expect a package. *Id.* The affidavit goes on to set forth Individual 1 and Individual 2's usual practice upon receiving a package:

that they kept a pound of methamphetamine to sell, that Individual 2 called Johnson and said, "I've got your shoes"; that they took separate vehicles to Johnson's apartment; and that they called Johnson when they arrived so he could let them into the main door of the apartment building and then into his apartment. *Id.*

The warrant affidavit indicated that Individual 1 and Individual 2 would deliver methamphetamine to Johnson at his apartment that evening "in accordance with their previous practice as described above." *Id.* It noted they would be equipped with electronic devices "with instructions to notify law enforcement by code upon their entrance into" Johnson's apartment. *Id.* The affidavit concluded by requesting an anticipatory search warrant "granting search" of Johnson's apartment "upon delivery of the package" to the apartment. *Id.*

The search warrant issued, granting search of Johnson's apartment as soon as the condition precedent occurred. The correct address was listed

in the warrant application and throughout the affidavit, but the warrant itself listed two different addresses: it authorized the search of the correct address, but only after "[t]he delivery of the subject package of methamphetamine" to an incorrect address "confirmed by use of coded language when the package actually enters the subject apartment." *Id.* The incorrect address listed in the condition precedent is clearly a typographical error: the incorrect address does not exist, and it consists of the same street name and apartment number as the correct address, but lists the wrong street number, flipping the first two digits of the correct street address so that 4325 (the correct number) becomes 3425 (the incorrect number).

The execution of the search warrant did not go according to plan. Individual 2 called Johnson prior to leaving the DEA office to let him know they were on the way with the "shoes." As they arrived, Johnson called Individual 2, asking where they were. When Individuals 1 and 2 walked up to Johnson's apartment, he was outside on his patio. Rather than letting them in through the main door to the building (and then into his apartment), he let them directly into his apartment through the sliding glass door in his patio area. Meanwhile, Inspector Brandt, on the entry team, attempted to open the main building door using the security code law enforcement had obtained from management at the apartment complex. The code did not work. Some members of the entry team, including Woodbury County Sheriff's Deputy Todd Peterson, moved to the sliding glass door. The door was locked. Deputy Peterson saw Johnson through the blinds, bent over the kitchen counter, looking at something, while Individual 1 and Individual 2 sat in the living room.

With the entry team at the ready, Officer Davis and Agent Minten sat in the parking lot listening to the wire on Individual 2. Officer Davis testified that they were listening for the "coded language" from Individual 1 and Individual 2 acknowledging the drugs were in the apartment. Specifically, Officer Davis testified that they were listening for Individual 2 to ask Johnson to confirm that the product was "right" (in amount and quality) and to tell Johnson they brought money since they were short last time. Agent Minten stated he heard the language, and he radioed law enforcement to execute the warrant. Officer Davis testified that although the audio quality was not great, he also heard the "verbiage." Officer Davis further testified that upon listening to the recording of the wire after-the-fact, using headphones to improve his ability to hear, he heard Individual 2 talk about both things they were looking for. Law enforcement used a battering ram to enter the sliding glass door on the patio. They found

8

Johnson in the bathroom with the methamphetamine. He was arrested and taken into custody.

Doc. 245 at 2-9 (internal footnotes omitted).

## II.    STANDARD OF REVIEW

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge

9

to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## III.    DISCUSSION

### A.    *Objections to Findings of Fact*

Johnson objects to the following findings of fact:

- "Individual 1's description matched Johnson."  Doc. 245 at 4.

- "Specifically, Officer Davis testified that they were listening for Individual 2 to ask Johnson to confirm that the product was 'right' (in amount and quality) and to tell Johnson they brought money since they were short last time.  Agent Minten stated he heard the language, and he radioed law enforcement to execute the warrant.  Officer Davis testified that although the audio quality was not great, he also heard the 'verbiage.'"  Doc. 245 at 9, 21-22.

Doc. 251 at 1-2.

With regard to the first objection, Johnson notes that as stated in the previous sentence of the R&R, "Individual 1 described a Black man in his mid40s or maybe older, noting all Black men looked alike to Individual 1."  Doc. 245 at 4, 19, n.8.  He argues that the description of "Arkansas" as a "black man" is insufficient to identify Johnson because Individual 1 thinks all black men look alike and notes that he is 65 years old, which is considerably older than "mid40s."  I do not find it to be a misstatement of the record that "Individual 1's description matched Johnson."  Individual 1's description of "Arkansas" was very broad: "a Black man in his mid40s or maybe older."  Johnson is a 65-year-old Black man and fits within that very broad description.  While I agree that the description does not precisely identify Johnson and is so vague that it could apply to many individuals, Johnson fits those broad characteristics.  Law enforcement had other reason to believe Johnson was their target and did not rely solely on Individual 1's description to target Johnson.  This objection is overruled.

10

With regard to Johnson's second objection, Johnson acknowledges that the above-quoted language is consistent with Davis' testimony, but objects to the extent it reflects a finding that (1) Johnson discussed the amount and quantity of any drugs or that (2) Minten and Davis heard Johnson discuss drugs. He asserts there was no such discussion triggering law enforcement's authority to enter and search his residence. I do not find that the quoted language reflects a finding that Johnson in fact discussed the amount and quantity of any drugs. I do find, however, that it reflects a finding that Davis heard the agreed-upon verbiage related to bringing Johnson the product he liked or the "right" product and that Davis believed Minten heard it as well.

This objection is overruled for two reasons. First, I have no reason to believe that Davis' testimony about what he heard and what Minten said he heard is not credible. Second, a finding that this verbiage was actually used is not necessary to conclude law enforcement was justified in entering and searching the residence. The triggering event for the anticipatory search warrant was delivery of the package to Johnson's apartment, not use of the coded language. *See* Doc. 186-2 at 14 (listing the required condition as: "The delivery of the subject package of methamphetamine to 3425 Fieldcrest Drive Apartment 1D, Sioux City, IA 51103 – *confirmed by use of coded language when the package actually enters the subject apartment*.") (emphasis added). As noted, the purpose of the coded language was to communicate that the triggering condition (delivery of the package to the apartment) had occurred. *Id.* at 9 ("[Individual 2] and [Individual 1] will be equipped with an electronic recording and communication device with instructions to notify law enforcement by code upon their entrance into Melroy Johnson Sr.'s apartment in 1D.").

The reason for this set up was that law enforcement anticipated Individuals 1 and 2 would enter through the main building door of the apartment complex (as they had done in the past) and enter Johnson's apartment from the interior of the building, out of sight from law enforcement surveillance. *See* Doc. 245 at 8. Of course, the delivery did not

11

happen as anticipated because Johnson allowed Individuals 1 and 2 to enter his apartment from the exterior of the building via his patio door. Therefore, law enforcement was able to observe the delivery of the package and did not need the coded language to confirm it had been delivered to Johnson. *See* Doc. 220 at 114-15 ("Whey they received a phone call from Mr. Johnson Senior, [Individual 2] advised that they're actually there. [Johnson] said, 'Oh, I'm right here too.' Surveillance confirmed that Mr. Johnson Senior greeted them at the patio section, and they all entered into the apartment through the patio door."). Nonetheless, Davis testified he and Minten listened to the conversation between Individual 2 and Johnson regarding the drugs and money. *Id.* at 115. Whether or not the coded language was actually used is of little consequence if its purpose had already been served by law enforcement's observation of Individuals 1 and 2 entering the apartment through the patio door and the entry team's observation of Johnson standing over the package inside the apartment.

Because the anticipatory search warrant was conditioned upon delivery of the package to Johnson's apartment via physical entrance by Individuals 1 and 2, and law enforcement observed the occurrence of that condition, law enforcement had authority to enter and search regardless of whether the coded language was actually used. For these reasons, this objection is overruled.

### B.   *Objections to Conclusions of Law*

Johnson objects to the following legal conclusions:

- That the "misleading" affidavit was merely "sloppy" and the result of no more than negligent conduct. He argues the affidavit was reflective of a reckless disregard for the truth and amounts to a *Franks* violation.

- "Even if the affidavit had corrected the misleading statements and set forth the facts in better detail, the affidavit would have established the existence of probable cause." Doc. 245 at 19. Johnson argues the affidavit would have lacked probable cause with the misleading statements and omissions corrected because there was little meaningful corroboration of the allegations against Johnson.

12

- That the *Leon* good faith exception applies. Johnson notes the good faith exception does not apply to a *Franks* violation and argues the number of errors in the execution of the warrant provides an independent basis for suppression and prevents a finding that officers acted in good faith.

Doc. 251 at 2-5. I will address the first and second objections together, followed by the third.

With regard to the nature of the affidavit, Johnson argues the following facts support his argument that the affidavit went beyond negligent conduct and amounted to a *Franks* violation:

- The affidavit misleadingly[5] suggested that Individual 1 and Individual 2 independently identified Johnson by his full name. He contends officers believed Johnson was their target before speaking with Individuals 1 and 2, and merely looked to them to confirm their hunch. When neither of the individuals could provide the full name of the recipient of the package, Individual 1 was given a "highly suggestive" photo-lineup of one black man (Johnson) after Individual 1 had stated all black men looked alike.

- The affidavit "makes it seem like Individual 1 and Individual 2 corroborated every aspect of each other's stories in separate interviews." Doc. 245 at 18. Because Individuals 1 and 2 did not corroborate every aspect of each other's stories, Johnson argues the affidavit was misleading. He contends Individual 1 provided limited information in an initial interview with Brandt and Individual 2 was the source of a significant majority of the information relevant to Johnson. While at the DEA office together, Johnson agrees with Judge Mahoney that "at most, it seems Individual 1 merely agreed with things Individual 2 said, rather than separately volunteering information in a manner corroborating Individual 2's statements." Doc. 245 at 19, n.8.

- The omission of information about prior surveillance of Individual 1 and Individual 2 was highly material. Johnson notes Individuals 1 and 2 were surveilled for "five and a half, six hours" on August 2, 2019, after Individual 1 retrieved a suspicious package. Because the purpose of the affidavit was to establish probable cause as to what Individuals 1 and 2 were doing with the packages of drugs they received, Johnson argues it was highly relevant what

---

[5] Johnson notes the R&R acknowledges the affidavit was misleading in this way.

Individuals 1 and 2 actually did with the August 2 suspicious package. He points out that during the nearly six hours of surveillance, it appears that Individuals 1 and 2 kept the package for themselves. He argues the affidavit should have disclosed that this surveillance did not corroborate Individual 1 and Individual 2's allegations.

- Judge Mahoney did not give sufficient weight to the omission from the affidavit that law enforcement planned to send Individuals 1 and 2 to Johnson's residence with money. *See* Doc. 245 at 20. The anticipatory search warrant was based on a finding of probable cause that the triggering condition – Johnson's acceptance of the package of drugs – would occur. Johnson argues the fact that law enforcement decided to send money with Individuals 1 and 2 made it more probable that Johnson would accept the package and that the affidavit should have disclosed this.

- Judge Mahoney should have placed more weight on the omission of the romantic relationship between Individuals 1 and 2 as well as Individual 1's felony criminal history. Johnson argues these factors were significant because Individual 2 was the source of most of the information against Johnson and Individual 1 simply agreed with what Individual 2 said. Johnson argues that Individual 1 was less likely to object to any information Individual 2 provided to law enforcement because Individual 1 was Individual 2's romantic partner. Johnson argues without this disclosure the affidavit misleadingly implied a greater significance to Individual 1's "corroboration" of Individual 2's allegations than was warranted. The failure to disclose Individual 1's criminal history (and Individual 2's concern over it) also prevented the court from understanding their shared motivation to incriminate another person.

Doc. 251 at 2-4.

After citing the standards for a *Franks* hearing, Judge Mahoney addressed the truthfulness of two statements in the affidavit (which Johnson does not challenge in his objections) and four omissions that Johnson argues should have been disclosed. She concluded a preponderance of the evidence did not establish a *Franks* violation. Doc. 245 at 17. She agreed with Johnson that certain statements in the affidavit were misleading, particularly regarding specific information provided by Individual 1 and Individual 2 and the circumstances in which they made their identifications of Johnson. *Id.* at 17-18. Based on the information provided at the suppression hearing, she explained

14

why certain statements or omissions in the affidavit were misleading. *Id.* Judge Mahoney ultimately concluded that law enforcement did not act intentionally or with reckless disregard for the truth in drafting the affidavit. *Id.* at 19. She found that the affidavit omitted "a lot of information relevant to probable cause," including facts that bolstered the existence of probable cause. *Id.* She noted that officers were working under a "time crunch" and that even if the affidavit had corrected the misleading statements and set forth the facts in better detail, it would have nonetheless established the existence of probable cause. *Id.* Indeed, she explained that law enforcement "knew much more information than contained in the affidavit, and they clearly had probable cause for the issuance of the warrant." *Id.* Further, Judge Mahoney did not find that law enforcement acted with the necessary mens rea in omitting the information about Individual 1's[6] criminal history, the August 2 surveillance,[7] the romantic relationship between Individuals 1 and 2 and the plan to bring Johnson money. *Id.* at 20. She concluded the omitted information was not critical to a probable cause finding and that the affidavit would have established probable cause even if this information had been included. *Id.*

A defendant is entitled to a *Franks* hearing if he or she can show (1) that the affiant "knowingly and intentionally" made false statements or made them in "reckless disregard for the truth" and (2) if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause. *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013). Neither mere negligence nor innocent mistake is sufficient to void a warrant. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). "A law enforcement official is not required to include everything he knows about a subject in his

---

[6] At times, the R&R refers to Individual 2's criminal history. However, it is apparent from the testimony at the suppression hearing and Johnson's motion that Individual 1 is the one with the criminal history.

[7] Judge Mahoney did not find this surveillance particularly probative, noting that it was not clear that law enforcement conducted surveillance until 8:30 p.m., when Individuals 1 and 2 would normally deliver the packages to Johnson. Doc. 245 at 20, n.9.

affidavit, whether it is material to a finding of probable cause or not." *Technical Ordnance, Inc. v. United States*, 244 F.3d 641, 649 (8th Cir. 2001).

Here, the affidavit provided in relevant part:

> In post-Miranda interviews both subjects said they were approached by Melroy Johnson Sr. to receive packages containing methamphetamine shipped to residences near [Individual 2's] residence . . . . [Individual 1 and Individual 2] admitted to receiving packages containing methamphetamine previous to August 28, 2019. [Individual 2 and Individual 1] stated Melroy calls [Individual 2] to give notice that a package is arriving. Upon receipt of the package, Individual 2 and Individual 1 open the package and keep 1 pound of methamphetamine for them to sell (for which they later owe $6000 to Melroy Johnson Sr.) and deliver the remaining methamphetamine to Melroy Johnson Sr. in a different package. [Individual 2] calls Melroy Johnson Sr and informs him "I've got your shoes" which is code for the methamphetamine. [Individual 2 and Individual 1] take separate vehicles to Melroy Johnson Sr.'s residence at the 4325 Fieldcrest Drive Apartment 1D in Sioux City, Iowa. 4325 Fieldcrest Drive is a three-story grey brick and siding apartment building with a secured entrance. 4325 Fieldcrest Drive is part of the Woodbury Heights apartment complex in Sioux City, Iowa. See Attachment A for a general picture of the Woodbury Heights Complex. Upon arrival, [Individual 2] calls Melroy Johnson Sr. and Melroy Johnson Sr. lets them into the apartment complex security door. [Individual 2 and Individual 1] accompany Melroy Johnson Sr. to his first floor apartment with the package containing methamphetamine and provide the package to Melroy Johnson Sr. once inside the apartment. Often [Individual 1 and Individual 2] stay at Melroy Johnson Sr.'s apartment to converse for a few minutes before leaving.

Doc. 186-2 at 8-9. As Judge Mahoney noted, the affidavit did not include any information about what the SOI told law enforcement,[8] the August 2 delivery in which law enforcement surveilled Individual 1 and Individual 2's receipt of a package, or law enforcement's confirmation of Johnson's address through public-records databases. Doc.

---

[8] The SOI identified Johnson as the intended recipient of the package that had been delivered to the SOI and also told law enforcement that other individuals in the Sioux City area received packages for Johnson.

245 at 7.

Testimony from the suppression hearing revealed the following regarding law enforcement's interviews with Individual 1 and Individual 2:

- Neither Individual 1 nor Individual 2 provided law enforcement with Johnson's name. Rather, Individual 1 stated they called the intended recipient of the package "Arkansas." Individual 2 stated they called the recipient "Barbeque." Individual 1 described Arkansas as a Black man in his mid40s or maybe older, noting that all Black men looked alike to Individual 1. When asked about Barbeque's real name Individual 2 stated: "It's Mel or . . .?" when the officer cut off Individual 2 and confirmed Mel was correct.

- Individual 1 was shown a picture of Johnson and identified him as Arkansas.

- Individual 2 initially denied any involvement until Officer Davis told Individual 2 they knew Individual 2 was receiving packages of drugs from California and they knew the ultimate recipient of the drugs, showing Individual 2 a picture of two Black men, one of whom was Johnson. Individual 2 pointed out Johnson in the photo.

- Both Individual 1 and Individual 2 stated the person to whom they delivered the packages lived in the Woodbury Heights apartment complex.

- Individual 2 stated they traveled separately to bring the drugs to Johnson with Individual 2 traveling in a Lyft and Individual 1 by car.

- After being informed that Individual 2 was cooperating, Individual 1 was asked if Individual 2 took a Lyft to the Woodbury Heights apartment complex while Individual 1 followed by car. Individual 1 nodded.

- Individual 2 noted they were not the only people who received packages for Johnson and told law enforcement Individual 2 knew about law enforcement's encounter with someone else who received packages for Johnson.

- When Individual 1 and Individual 2 were taken to the DEA office while the anticipatory search warrant was being prepared, Individual 2 primarily responded to questions from officers about their usual procedure for delivering drugs to Johnson. Individual 1 did not disagree with anything Individual 2 said.

17

- Individual 2 told law enforcement they owed Johnson $10,000 and would pay him incrementally for the methamphetamine they were fronted. Law enforcement decided Individuals 1 and 2 would bring Johnson $500 in addition to delivering the drugs, which would be within the norm of their usual transactions.

- Individual 1 has a criminal history, including a felony drug conviction

- Individual 1 and 2 are in a romantic relationship.

*See* Doc. 245 at 4-7; Doc. 220.

Johnson points out that neither Individual 1 nor Individual 2 was able to identify Johnson by his full name, as suggested by the affidavit. He states officers already believed their target was Johnson. When Individual 1 provided a vague description and said all Black men looked alike to Individual 1, Brandt provided a photograph of Johnson and Individual 1 agreed that was the person to whom Individual 1 was referring.

I agree with Judge Mahoney that the affidavit should have been more precise regarding what Individual 1 and Individual 2 said about the person to whom they intended to deliver the package and knew only by nickname. However, there is nothing in the record to suggest that these details were left out intentionally or with a reckless disregard for the truth. Instead, it appears the affiant was summarizing the information law enforcement believed it had gleaned from the interviews, rather than describing what Individuals 1 and 2 had actually said to lead officers to that conclusion.

Further, inclusion of these details (and others) would not destroy probable cause. It is clear from the record at the suppression hearing that officers believed their target was Johnson before they spoke to Individuals 1 and 2. Inclusion of this information would have contributed to probable cause. Individuals 1 and 2 said nothing that was inconsistent with this previous information. Indeed, they corroborated it in many ways, even if the details they provided were vague or small (such as Individual 1's description of Arkansas, which triggered Brandt's memory of seeing mailing addresses associated with Johnson in Arkansas).

I agree with Johnson that the photographic identification was highly suggestive, and thus of little value, but other details provided by Individual 1 and Individual 2 (such as pointing out Johnson's apartment on a map of the apartment complex where they knew he lived) were more precise in identifying Johnson.[9] Individual 2 was also able to recall Johnson's first name. It seems apparent that the officers believed Individual 1 and Individual 2 had provided enough detail to believe that the person they identified was Johnson. Rather than explaining how they arrived at that conclusion, the officers misleadingly stated that Individuals 1 and 2 said they were approached by Melroy Johnson. However, clarification of these matters in the affidavit would not have prevented a finding of probable cause, as it would have been reasonable for the issuing judge to make the same conclusion – that Individual 1 and Individual 2 had identified Johnson as the intended recipient of the package.

Johnson also takes issue with the affidavit because it suggests that Individual 1 and Individual 2 corroborated every part of each other's stories when, in fact, Individual 2 provided the majority of information and Individual 1 merely agreed with what Individual 2 said. Judge Mahoney acknowledged that the affidavit was flawed in this way and I agree. However, I also agree that the affidavit would have established probable cause had it been corrected to accurately specify the information provided by Individuals 1 and 2. While they did not corroborate all aspects of each other's stories, they had several similarities, including how they came into contact with Johnson (through the television-repair business) and what they would do with the package upon receipt (deliver it to Johnson at his apartment in the Woodbury Heights apartment complex). While Individual 2 described the scheme in far more detail, nothing Individual 1 said was inconsistent with those details based on their separate interviews.

---

[9] While I agree that officers probably should have included the fact that they had confirmed Johnson's address using public records databases, this seems either implied or is immaterial to the finding of probable cause.

19

This is not surprising, as it appears Individual 2 was more involved. Johnson had approached Individual 2 at the television-repair business, Individual 2 called Johnson upon receipt of the package, Individual 2 knew the details of the exchange, including how much they were fronted and what was in the packages, and Individual 2 knew that law enforcement had spoken with another individual who received packages on Johnson's behalf. Individual 1 denied knowledge of the package's contents and stated Individual 1 retrieved the packages at Individual 2's direction. When they were asked questions together at the DEA office, it is not surprising that Individual 2 provided the answers and Individual 1 nodded along. The fact that Individual 1 did not separately corroborate all the details of the scheme is not necessary to find probable cause, especially because both Individual 1 and Individual 2 suggested Individual 1 had a more limited role in retrieving the packages and driving a separate vehicle to Johnson's apartment.

Next, Johnson takes issue with the omission of law enforcement's prior surveillance of Individuals 1 and 2 upon receipt of a package on August 2. Specifically, he argues that this surveillance did not corroborate Individual 1's and Individual 2's allegations, because during the five-and-a-half to six hours of surveillance, Individual 1 and Individual 2 did not deliver the package to Johnson. I agree with Judge Mahoney that this surveillance is not material to a finding of probable cause given that it is not clear from the testimony when the surveillance was conducted. Individual 2 stated they normally delivered the package around 8:30 p.m. the day it arrived. It is not clear from the record whether law enforcement was conducting surveillance on Individual 1 and Individual 2 around this time on August 2. In other words, the August 2 surveillance provides little information relevant to probable cause except that Individual 1 and Individual 2 had previously received a package coming from California that was similar to the package delivered to the SOI. Inclusion of this information in the affidavit would not have affected a probable cause determination.

Johnson also argues Judge Mahoney did not give sufficient weight to the affidavit's

omission that the officers decided to send Individual 1 and Individual 2 into Johnson's apartment with money. He contends this made it more likely he would accept the package. Again, I do not find this omission was made intentionally or with reckless disregard for the truth. There was significant evidence from which to believe that Johnson would have accepted the package without any payment from Individual 1 and Individual 2. Nor would inclusion of this fact have changed the probable cause finding or made it more likely that the triggering condition would have occurred. The affidavit explained the usual manner of delivery, including that Individuals 1 and 2 would keep one pound of methamphetamine to sell (for which they would later owe $6,000 to Johnson). Doc. 186-2 at 8. Had the affidavit stated law enforcement intended Individuals 1 and 2 to deliver money in addition to the package, this would have been consistent with the scheme as described by Individual 2. There is no evidence that Johnson was somehow duped into accepting the package based on the presence of money. Rather, the anticipatory search warrant was based on delivery of the package to Johnson's apartment in a manner consistent with previous deliveries, as described by Individuals 1 and 2. An incremental payment to Johnson was consistent with previous deliveries and inclusion of this detail in the affidavit would have only bolstered a probable cause finding.

Finally, Johnson argues Judge Mahoney should have given more weight to the romantic relationship between Individuals 1 and 2 and Individual 1's felony criminal history. He contends that a proper understanding of these factors would have alerted the issuing judge as to why Individual 1 was so agreeable with what Individual 2 was telling officers and raised questions as to the extent of "corroboration" Individual 1 was providing. He also argues that disclosure of Individual 1's criminal history would have given the court an understanding of Individual 1's and Individual 2's motivation to incriminate a third party. I agree that these details should have been included as they provide context to the situation and would have allowed the judge issuing the search warrant to more fully assess the credibility of Individual 1 and Individual 2. However,

these details are minor given the full scope of information that law enforcement had already gathered on Johnson. Moreover, Individual 1 did separately corroborate some information provided by Individual 2 about Johnson – including how they met Johnson, his description, where he lived and the manner in which they would deliver the package to Johnson. Further, as Judge Mahoney pointed out, Individual 1's criminal history did not include lying to the police. *See* Doc. 245 at 21. Inclusion of these details would not have altered the probable cause finding.

In sum, I agree with Judge Mahoney that the omissions and challenged statements from the affidavit do not appear to have been made intentionally or with reckless disregard for the truth but are the result of mere negligence. There is no evidence in the record that officers excluded information or manipulated information for some sort of tactical advantage or with a deceitful purpose. The omissions and challenged statements are consistent with oversights made during the time crunch officers were facing as they left out some details and summarized others that led to the affidavit being misleading in certain aspects as discussed in the R&R. Moreover, as Judge Mahoney explained, some of the omissions from the affidavit would actually contribute to a finding of probable cause, not detract from it. I also agree with her that if all of the omissions were included and information corrected, there would still be probable cause. Johnson's objections related to the affidavit are overruled.

As to whether the *Leon* good faith exception applies, Johnson is correct that it does not apply when there is a *Franks* violation. *See United States v. Leon*, 468 U.S. 897, 923 (1984) (listing a *Franks* violation as one of four circumstances under which the good faith exception does not apply). As detailed above, there is no reason to believe that omissions from the affidavit were intentional or made with reckless disregard for the truth. Moreover, there would be probable cause to support the anticipatory search warrant even if the omissions had been included and other aspects of the affidavit corrected. As such, there was no *Franks* violation. Johnson's objection to application

of the *Leon* good faith exception is overruled.  *See United States v. Davis*, 471 F.3d 938, 947 (8th Cir. 2006) ("Because Davis's *Franks* claim fails, we need not reach the *Leon* good-faith argument.").

As to other aspects of the R&R to which Johnson did not object, I have reviewed these for clear error and have found none.

## IV.    CONCLUSION

For the reasons set forth herein:

1.    Johnson's objections (Doc. 251) to the Report and Recommendation (Doc. 245) are **overruled**;

2.    I **accept** the Report and Recommendation (Doc. 245) **without modification**;

3.    Pursuant to Judge Mahoney's recommendation, Johnson's motion (Doc. 185) to suppress is **denied**.


**IT IS SO ORDERED.**

**DATED** this 11th day of December, 2020.


_____
Leonard T. Strand, Chief Judge

Case 5:19-cr-04065-LTS-KEM   Document 261   Filed 12/11/20   Page 23 of 23